.










```
VLS    6/25/01    9:38
3:01-CR-01652   USA V. SAVCHENKO
*21*
*CRMEMSUP.*
```

PATRICK K. O'TOOLE
United States Attorney
WILLIAM V. GALLO
Assistant U.S. Attorney
California Bar No. 123717
KAREN E. MOORE
Assistant U.S. Attorney
California Bar No. 206573
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone Nos.: (619) 557-6964/5104

Attorneys for Plaintiff
United States of America



UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> VIKTOR SAVCHENKO, et. al., ) <br> ) <br> Defendants. ) <br> ) <br> ) <br> _____ ) | Case No. 01cr1652-JM <br><br> DATE: July 6, 2001 <br> TIME: 1:30 p.m. <br><br> STATEMENT OF FACTS IN SUPPORT OF GOVERNMENT'S NOTICE OF MOTION AND MOTION FOR DISPOSAL OF EVIDENCE |

I

STATEMENT OF FACTS

On or about April 28, 2001, the United States Ship Rodney M. Davis with a Coast Guard Law Enforcement Detachment (104) embarked were on routine patrol in international waters, approximately 500 miles off of the coast of Acapulco, Mexico. LEDET 104 conducted a boarding of the Belizean-flagged vessel, Svesda Maru, a 152-foot fishing vessel. Savchenko, the master of the Svesda Maru, claimed that he and his crew had been underway since approximately April 6, 2001, on a fishing trip and that they departed from Ecuador.

The LEDET noted that there were several hundred pounds of small fish (squid, etc.) that are commonly used as bait. The bait, however, was frozen solid and did not appear to have been disturbed in some time. There were only approximately 12 fish on board (10 small sharks and 2 moderate to large mahi-mahi). While these fish are consistent with the type of fish commercial fisherman would catch,



the quantity was extremely suspect given the amount of time at sea by the time of the boarding, approximately 3 weeks. Moreover, none of the fish appeared to have been freshly caught and one shark appeared to have begun to decompose.

The fishing gear did not appear to be in operable condition or appear that it had been used in a long time. There was rust on the gear and the lines were tangled. Moreover, there were no hooks found anywhere on the boat.

The crew's apparel also did not seem consistent with that typically worn by commercial fisherman. All were either wearing flip-flops or walking barefoot which is extremely rare for professional fisherman. They all wore shorts and t-shirts or shorts with colorful button-down shirts. One defendant wore Tommy Hilfiger clothes. The LEDET did not notice any fishing apparel or clothes that smelled like fish.

After an exhaustive five-day search comprising 93% of the vessel, LEDET 104 was unable to find any drugs. On May 3, 2001, the LEDET was relieved by Coast Guard personnel aboard the Cutter Active, who resumed the search of the remaining 7% of the Svesda Maru. The Active's boarding team found the cocaine well hidden in one of the vessel's fuel tanks.

Shortly after the discovery of the cocaine, some 13 tons, Belize consented to U.S. jurisdiction. Thereafter, the Coast Guard began to steam to San Diego with the Svesda Maru and its crew. Initially, the Svesda Maru operated under its own power. However, it developed an engine casualty en route which necessitated that it be towed by the Cutter Active for the remainder of the journey to San Diego. The engine casualty also had the collateral affect of cutting off power to the refrigeration units onboard the Svesda Maru which cooled the fish holds where the fish and bait were stored.

On Sunday, May 13, 2001, the Cutter Active, with the Svesda Maru in tow, reached San Diego. Later that day, a probable cause determination based upon a sworn statement of facts was signed before Magistrate Judge Anthony J. Battaglia. On May 14, 2001, a complaint was filed and the defendants made their initial appearance before Magistrate Judge Battaglia. Three days later, a detention hearing was held, also before Magistrate Judge Battaglia, and all defendants were detained. Also on May 17, 2001, without any prior notice to the Government, defendant Shishkovsky presented an order for preservation of evidence which Magistrate Judge Battaglia signed. See Exhibit 1.

Judge Battaglia's May 17th Order pertained to not only the traditional evidence but also the 13 tons of cocaine, 12 fish, and all of the fish bait seized from the Svesda Maru. On May 18th, by letter addressed to all defense counsel, the Government put the defendants on notice of our desire for the defendants to expeditiously reweigh, inspect, and analyze the cocaine. See Exhibit 2. In addition, the Government provided the defense with photographs of the cocaine and its packaging and a copy of the DEA database called Fountainhead, which attempts to record all cocaine seizures worldwide. However, to date no defense expert has examined the cocaine. The defense has had a defense expert conduct a cursory examination of the Svesda Maru as well as the fish and bait, but a detailed analysis has yet to occur.

During the search of the Svesda Maru for the cocaine, the Coast Guard breached several fuel tanks causing the diesel fuel contained therein to enter the secret spaces where the cocaine was hidden. This in turn resulted in the saturation of the cocaine with diesel fuel. Because of the cocaine's condition, it could not be stored as is customary at the DEA laboratory. The diesel-saturated cocaine creates a hazardous condition, not only for risk of fire or explosion, but also environmental for all those exposed to its fumes. Moreover, even if the cocaine was not saturated with diesel fuel, the DEA laboratory is at near capacity because of previous large seizures of cocaine from other boat cases and would be unable to store all of the cocaine in this case. Consequently, the cocaine, save 234 kilograms which have been placed in sealed containers and stored at the DEA laboratory, has been warehoused at a secure off-site contract facility at tremendous expense to the DEA. The cost to store the cocaine for the facility and the guards is approximately $45,000 per month. Storing this quantity of cocaine at a leased facility obviously creates special security concerns. Funding for the guard service will run out on July 30, 2001. At that time, if the cocaine has not been disposed of, the DEA will be forced to allocate agents to assume guard responsibilities.

On June 7, 2001, the Government and the majority of defense counsel met to discuss the preservation or disposal of the cocaine and fish and bait. Also in attendance were representatives of the DEA to include laboratory personnel. The DEA explained the procedure by which the cocaine seized in this case was processed, catalogued, and boxed for evidence storage. The procedure was as follows: the cocaine bulk was photographed; all cocaine bricks with similar outside markings were segregated

by type and photographed; representative samples of each different type of cocaine brick were then placed in separate boxes; a DEA chemist also conducted a field analysis of representative samples of each type of cocaine brick; and each box (some 625) was weighed. In addition, at this meeting, each defense counsel in attendance received a copy of the DEA 7 report (lab analysis) and copies of several pages of the DEA log reflecting the evidence log-in process. The DEA has agreed to maintain 13 boxes of cocaine, weighing 234 kilograms. This quantity represents every kind (by packaging) of cocaine brick seized. Moreover, the DEA chemist agreed that the DEA laboratory would test one sample from each group to include testing for any adulterants or diluents.

The 12 fish and the bait together weigh approximately 10 tons. Although just an estimate, the fish weigh approximately 2-3 tons and the bait, which is squid in boxes, makes up the remainder. Initially, the fish and bait were stored in a refrigerated trailer but this proved inadequate as it did not properly preserve the evidence. The cost for the trailer was $1,400 per month. Beginning on May 30th, the fish and bait were moved to a location where it has been flash frozen to a temperature of -40 degrees Fahrenheit. The cost for the storage is as follows: $2,200 for the initial handling and transportation; $731 per month thereafter; and a $3,000 dumping fee upon disposal.

II

POINTS AND AUTHORITIES

A. Due Process Does Not Require That the Government Continue to Preserve the Evidence

1. Introduction

The Government desires to dispose of the entire quantity of fish and bait and the bulk of the cocaine, retaining approximately 234 kilograms. The Government submits that the defense has had sufficient time to conduct whatever analysis of the cocaine and fish/bait that they deem appropriate and have failed to do so. It has now been more than one month, and it will be nearly two months by the time this motion is heard, since the defense was able to secure the preservation of evidence Order of May 17th. The Government, while initially willing to preserve the evidence, believes now that the time has come for this Court to set a reasonable time limit by which the defendants must conduct their analsyis. Given the expense involved and, for the fish, its lack of evidentiary value, and for the cocaine, the

retention of a reasonable representative sample of 234 kilograms, there is no good, valid, or justifiable reason for the Government to keep the evidence any longer.

To demonstrate that the government's failure to preserve evidence infringed a defendant's due process right to a fair trial, the defendant must show that the evidence "both possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." California v. Trombetta, 467 U.S. 479, 489 (1984). In addition, where the police fail to preserve potentially useful evidence, the defendant must show that the police acted in bad faith. See Arizona v. Youngblood, 488 U.S. 51, 58 (1988). "The presence or absence of bad faith by the police ... turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Id. at 56 n.*.

As these cases and others demonstrate, the burden is on the defendant to establish the requisite showing stated in Trombetta and Youngblood. In this case, the defense has not stated with any particularity how the cocaine, fish, or bait is exculpatory. Thus far, every argument made by the defendants has been couched in terms that the cocaine and fish/bait "possibly," "may be," or "could be" helpful to the defense. This is woefully insufficient to justify the continued preservation of the evidence, especially since the defense has had over a month to conduct an analysis and has not done so.

2.  The Fish and Bait

The defense continues to argue that before it's fish expert can conduct an analysis, it must know the Government's theory of the case and have the Government's expert's opinion. This argument is without merit and the defense has cited no case nor presented a logical argument to support their contention. First, as far as the Government is concerned, it is not what is contained in the belly of these fish that is important or critical nor has the defense offered any cogent or reasonable explanation as to how it is. The Government contends that it is the number of fish, or lack thereof, that is most telling. An expert is not needed to determine the quantity of fish. Second, if a defense expert is truly an "expert," then he/she should be able to do a comprehensive examination that would anticipate the Government's theory. However, as said in the previous sentence, it is the number of fish that is significant, not what the fish ate at some undetermined time and place. Third, for the defense to demand that the Government disclose its Rule 16 experts and their opinions at such an early stage of the case is

one, unreasonable, and two, unsupportable. Furthermore, at this time, the Government has not identified any experts. Nevertheless, if the defense believes that its experts cannot conduct an adequate analysis without first knowing what the Government's experts would opine, then the Government suggests that the defendants take custody of the fish/bait and maintain it for as long as they like.

The Government, however, does not concede that the evidence is exculpatory, or even "potentially exculpatory." To the contrary, the Government contends that the fish is inculpatory, and as such, the Government has no duty to preserve it. It is and will be the Government's contention that the fish have great <u>inculpatory</u> value because of the condition (poor) and quantity (relatively very little given the amount of time purportedly fishing). Of course, the fishing equipment, which still exists and is in either in very poor condition or altogether inoperable, supports the Government's belief that the defendants were not involved in legitimate commercial fishing, and thus, reinforces the conclusion that the fish is inculpatory rather than exculpatory. However, if this Court believes, despite the inadequate showing thus far made by the defense, that the fish/bait are "necessary for adequate representation," then the payment for the storage of the fish/bait should rightfully come from CJA funds, not DEA funds.

The Criminal Justice Act (18 U.S.C. §3006A) provides in pertinent part at subsection (e)(1):

> Counsel for a person who is financially unable to obtain investigative, <u>expert, or other services necessary for adequate representation</u> may request them in an ex parte application. Upon finding, after appropriate inquiry . . . that the services are necessary . . . the court . . . <u>shall</u> authorize counsel to obtain the services. (Emphasis added.)

Moreover, because the fish/bait still exist, the defendants should be compelled to expeditiously conduct their examination so there will be comparable evidence reasonably available. In this case, there are several, indeed many, witnesses who can testify about the fish/bait and their condition and quantity. First, the U.S. Coast Guard officers who boarded and inspected the fish can testify about their observations. These observations have been documented in witness statements which have been provided to the defendants. Second, and perhaps most importantly, the codefendants can testify about their activities and the fish onboard.

The Government anticipates that the defendants may cite <u>United States v. Cooper</u>, 983 F.2d 928 (9th Cir. 1993) to support the argument that the destruction of evidence with no comparable alternative violates a defendant's due process rights. <u>Cooper</u> is inapposite. In <u>Cooper</u>, a methamphetamine

manufacturing case, the DEA seized, then destroyed, laboratory equipment, which the defendants claimed <u>before</u> the destruction occurred was exculpatory. The government conceded that the evidence was, in fact, exculpatory, that the government knew of its exculpatory value before the destruction, and that the destruction was in bad faith. The issue in <u>Cooper</u> was whether there was reasonably available comparable evidence. The nature of the evidence, that is the laboratory equipment, once destroyed, made it incapable of being examined and tested by experts. Consequently, there was no comparable evidence available despite the government's willingness to stipulate to very favorable defense facts about the equipment. The Ninth Circuit concluded that the stipulation was a poor substitute and the actual evidence was necessary and dismissed the indictment rather than simply suppress evidence, which is what the government wanted in the alternative. The outcome in <u>Cooper</u> was very harsh, and the Government herein submits, was at least in part driven by the conceded bad faith of the DEA in destroying the evidence.

In the instant action, we do not have the same facts. First, the Government has maintained the fish for a considerable period without any effort by the defense to conduct an examination. Second, as mentioned above, the fish is inculpatory, not exculpatory. Third, the defendants have yet been unable to explain or demonstrate how the continued preservation of the fish/bait will lead to exculpatory or even potentially exculpatory evidence. Finally, there is no bad faith here.

If the defense wants to test the fish, then do it now or take possession of the fish and do it when convenient to the defense. Otherwise, the Government ought to be relieved of the burden of storing the fish/bait.

3.   <u>The Cocaine</u>

As with the fish, the defense argues that before the cocaine is destroyed, they must know the Government's theory of the case and be provided with the Government's experts and their opinions. For the same reasons advanced earlier in this memorandum, this arguments holds no water. Nevertheless, the Government has provided the defense with the most recent DEA Fountainhead database publication and the transcripts of Government expert testimony from the trial of <u>United States v. Klimavicicius, et al</u>, 95cr1421-H. Although not required to provide this information at this point, the Government did

so in order to give the defense an idea or preview of the Government's theory of the case with the understanding that this theory could change as new information is acquired.

In the Klimavicius case, the Government relied upon expert testimony to establish the required nexus. DEA experts testified about the modus operandi of Colombian maritime drug traffickers and the significance of cocaine markings that are contained on the packaging material as well as imprinted into the cocaine bricks. The Ninth Circuit found this information to be particularly significant. United States v. Klimavicius, 144 F.3d 1249, 1258 (9th Cir. 1998). The Fountainhead database contains photographs of cocaine packaging from seizures made by the United States and around the world which have been reported to the DEA. From this database, the defense can compare the photographs contained therein with the packaging markings on the cocaine bricks seized here. This, together with the expert testimony transcripts, provides the defense with a sufficient view of the Government's theory. In this regard, the defendants have everything that is necessary to conduct a defense on the issue of jurisdiction. Preservation of the bulk of the cocaine beyond the 234 kilograms is unnecessary.

The Government is willing to preserve 234 kilograms which represents every different type packaging of cocaine until the end of the trial. This cocaine can be stored at the DEA lab in specially designed airtight containers which will eliminate the hazardous condition created by the diesel fuel. The defense has not presented a valid argument why all 13 tons of the cocaine must be preserved. But like the fish, the defense has made no effort to have their expert inspect or analyze the cocaine. The time has come to set a reasonable deadline by which the defense must have conducted their analysis.

B. Conclusion

In the dissenting opinion of Justice Blackmun in Youngblood, he laid out a three-prong test to determine whether police have a duty to preserve physical evidence when no comparable evidence is likely to be available to the defendant. Youngblood, 488 U.S. at 70-71. Under the first prong, one must look to the evidence itself. It must be of a type which is clearly relevant. The second prong directs one to ask whether the evidence is of a type likely to be independently exculpatory. The evidence must also be without equivalent in the particular case and it must bear directly on the question of innocence or guilt. Finally, the third prong states that the burden that preserving the evidence places upon the police must be taken into account. Justice Blackmun stated, "law enforcement officers must be provided the

option, as is implicit in Trombetta, of performing the proper tests on physical evidence and then discarding it. Once a suspect has been arrested the police, after a reasonable time, may inform defense counsel of plans to discard the evidence. When the defense has been informed of the existence of the evidence, *after a reasonable time the burden of preservation may shift to the defense.* There should also be flexibility to deal with evidence that is *unusually dangerous or difficult to store.*" Id. at 71. (Emphasis added).

In this case, the financial and logistical burden upon the Government of preserving the fish, bait, and cocaine is enormous. The defendants have had adequate time to conduct an inspection and analysis and have not done so. Whether their failure to do so is deliberate or simply a lack of due diligence is irrelevant. The fact of the matter remains that the Government has preserved the evidence for long enough and there are adequate alternatives to preserving the evidence (e.g. photographs or retaining some of the cocaine). The burden should now be on the defendants to justify further retention.

The Government is prepared to turn over the fish and bait to the defense for their storage and at their expense. The Government is prepared to preserve a significant quantity of cocaine (234 kilograms). The defendants have not presented persuasive or convincing arguments why the evidence must be preserved indefinitely.

All the Government is seeking is a reasonable balance between the rights of the defendants to the evidence and the burden to the Government of maintaining that evidence at great expense. The defense has had sufficient opportunity to conduct tests and inspections of the evidence and have not done so.

//
//
//
//
//
//
//
//

1  WHEREFORE, this Court should now set a reasonable deadline by which all defense expert
2  analysis must be conducted. The Government submits that that deadline should be no later than July 30,
3  2001.
4  DATE: June 22, 2001.

Respectfully submitted,

PATRICK K. O'TOOLE
United States Attorney

*[signature]*

WILLIAM V. GALLO
Assistant U.S. Attorney

*[signature]* for

KAREN E. MOORE
Assistant U.S. Attorney

# EXHIBIT 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE ANTHONY J. BATTAGLIA)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case: 01MG1247 |
| Plaintiff, | ) | |
| v. | ) | ORDER PRESERVING EVIDENCE |
| PETR SHISHKOVSKY, | ) | |
| Defendant. | ) | |

In accordance with United States Southern District Local Rule 16.1, and any and all other applicable rules and statutes, PETR SHISHKOVSKY has requested the preservation of evidence in this case on May 17, 2001. Mr. Shishkovsky specifically requested that any and all evidence within the possession of the government that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and which relate to the arrest or the events leading to the arrest in this case be preserved. The request for preservation of evidence was granted.

//
//
//
//
//

4

**IT IS HEREBY ORDERED**, without prejudice, that the United States Government preserve the following evidence, within its possession and/or control, until further order of the court:

(1) <u>The Defendant's Statements</u> (any and all statements of defendant within the government's possession and/or control);

(2) <u>Arrest Reports, Notes and Dispatch Tapes</u> (any and all reports, notes, and tapes, within the government's possession and/or control);

(3) <u>Reports of Scientific Tests or Examinations</u> (any and all tests or examinations within the government's possession and/or control);

(4) <u>Brady Material</u> (within the government's possession and/or control);

(5) <u>Evidence Seized</u> (any and all evidence seized within the government's possession and/or control);

(6) <u>Tangible Objects</u> (any and all tangible objects within the government's possession and/or control);

(7) <u>Statements Relevant to the Defense</u> (any and all statements relevant to the defense within the government's possession and/or control, including material witness statements);

(8) <u>Jencks Act Material</u> (within the government's possession and/or control);

(9) <u>Giglio Information</u> (within the government's possession and/or control);

(10) <u>Law Enforcement Personnel Files</u> (any and all personnel files within the government's possession and/or control).

(11) *Freeze and maintain the fish cargo and bait to preserve it in its current state for further testing.*

SO ORDERED.

DATE: 5/17/01

_____
HONORABLE ANTHONY J. BATTAGLIA
United States Magistrate Judge

PRESENTED BY:
MARK S. WINDSOR

Attorney for Mr. Shishkovsky

# EXHIBIT 2




**U.S. Department of Justice**

**Gregory A. Vega**
United States Attorney
Southern District of California

William V. Gallo     (619) 557-6964
Assistant United States Attorney     Fax (619) 557-7053

San Diego County Office
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893

Imperial County Office
321 South Waterman Avenue
Room 204
El Centro, California 92243-2215

May 18, 2001

All Defense Counsel

    Re: <u>United States v. Savchenko, et al</u>, 01mg1247

Dear Counsel:

    The cocaine in this case weighs approximately 13 tons. As you can imagine, it is enormous in size and occupies considerable space. The DEA Laboratory already is busting at the seams because of previous boat case seizures, also of significant quantities. To compound the problem in this case is the fact that the cocaine in this case is contaminated with diesel fuel, making it hazardous and incapable of being stored at the DEA Lab. Consequently, the DEA is having to store the cocaine in a secure contract facility at great expense. Accordingly, we will be requesting at the very first appearance before the district court that the attached proposed order be signed. We are providing you with sufficient advance notice so that you will be in a position to address this issue at that time.

    In addition to the attached draft order, we are also providing you now with photographs of the cocaine packaging showing the various markings, logos and labels which were found on the outside packaging material. Also, some (very few) of the cocaine bricks were opened to expose the raw cocaine. You are also being provided with photographs of the imprints which were found therein. Finally, you are being provided at this time with the DEA publication from Operation Fountainhead, which is a DEA database that contains photographs of packaging markings and imprints from cocaine seizures worldwide.

    We believe that by providing you with the photographs and documentation at this time you should have ample information at your disposal to conduct an intelligent and meaningful inspection of the cocaine. Moreover, because of the condition of the cocaine and its quantity, we must dispose of the cocaine as soon as possible. Therefore, as you can see in the draft order, we will urge the Court to allow destruction to occur anytime after 30 days from the date of the district court appearance. We believe that 30 days gives you more than sufficient time to arrange to inspect the cocaine.

Sincerely,

GREGORY A. VEGA
United States Attorney

WILLIAM V. GALLO
Assistant U.S. Attorney

Savchenko\AllDCs_Ltr1

|    |                                          |                                      |
|----|------------------------------------------|--------------------------------------|
| 1  | UNITED STATES OF AMERICA                 |                                      |
| 2  | SOUTHERN DISTRICT OF CALIFORNIA          |                                      |
| 3  | UNITED STATES OF AMERICA,           )    | Criminal Case No. 01cr1652-JM        |
| 4  | Plaintiff,                          )    |                                      |
| 5  | v.                                  )    | CERTIFICATE OF SERVICE BY MAIL       |
| 6  | VIKTOR SAVCHENKO (1), MYKOLA IHNATENKO (2), PETR SHISHKOVSKY (3), MYKHAILO YURCHENKO (4), ALEXANDRE CHAGOVIC (5), ANATOLI ZAKHAROV (6), OLEKSANDR KURYS (7), YEVGEN KURYS (8), VOLODYMYR CHAPNY (9), PAVEL RYMAREV (10), ) ) ) ) ) ) ) ) | |
| 11 | Defendants.                         )    |                                      |

IT IS HEREBY CERTIFIED THAT:

I, Nancy S. Shaw, am a citizen of the United States over the age of eighteen years and a resident of San Diego County, California; my business address is 880 Front Street, San Diego, California 92101-8893; I am not a party to the above-entitled action; and

On this date, I deposited in the United States mail at San Diego, California, in the above-entitled action, in an envelope bearing the requisite postage, a copy of Government's Notice of Motion and Motion for Disposal of Evidence and Statement of Facts in Support, addressed to Jeremy D. Warren, Esq., 101 Broadway, Ste. 600, San Diego, CA 92101, Benjamin L. Coleman, Esq., Federal Defenders of San Diego, Inc., 225 Broadway, Suite 900, San Diego, CA 92101, Mark S. Windsor, Esq., 964 5th Ave., Ste. 214, San Diego, CA 92101, Mary Frances Prevost, Esq., 3115 4th Ave., San Diego, CA 92103, Russell S. Babcock, Esq., 1400 Sixth Ave., Ste. 210B, San Diego, CA 92101, Michael L. Crowley, Esq., 110 W. C St., Ste. 2100, San Diego, CA 92101, Charles N. Guthrie, Esq., 444 W. C St., Ste. 140, San Diego, CA 92101, Robert Carriedo, Esq., 105 W. F St., Ste. 203, San Diego, CA 92101, David H. Bartick, Esq., 105 W. F St., Ste. 306, San Diego, CA 92101, and E. Joseph Cox, Esq., 1140

//

//

Union St., Ste. 213, San Diego, CA 92101; the last known addresses, at which place there is delivery service of mail from the United States Postal Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 22nd day June, 2001.

*Nancy S. Shaw*
NANCY S. SHAW